UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Criminal No.  14-0211 (EGS) |
| | ) | |
| INTELLIGENT DECISIONS, INC. | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**DEFENDANT'S BRIEF ADDRESSING THE ISSUES RAISED
IN THE COURT'S ORDER OF NOVEMBER 13, 2014**

On October 6, 2014, Defendant Intelligent Decisions, Inc. ("ID") entered into a deferred prosecution agreement ("the DPA") with the United States.  ID and the United States have jointly requested that the Court approve the exclusion from Speedy Trial Act computation the DPA's two-year term, "during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant . . . for the purpose of allowing the defendant to demonstrate his good conduct."  18 U.S.C. § 3161(h)(2).  In response to the Court's order of November 13, 2014, this brief addresses the issues raised by the Court in connection with this question in the *Saena Tech* case, including the scope of the Court's "approval" authority under 18 U.S.C. § 3161(h)(2), and the potential use of the Court's contempt power to ensure compliance with a deferred prosecution agreement.

## 1.    The Issues Raised By The Court In The Saena Tech Case

In the *Saena Tech* matter, the Court, and amicus appointed by the Court, expressed concern that the "nonadversarial" nature of a deferred prosecution agreement may raise concerns with regard to the degree the *parties'* agreement does or does not satisfy the *public's* interest in

ensuring that those who commit crimes receive punishment that is fair and reasonable, and that they are held accountable. *United States v. Saena Tech*, No. 14-166 (D.D.C. Sept. 5, 2014) ("Saena Tech Tr.") at 56; Memorandum of Law of *Amicus* Law Professor, *United States v. Saena Tech*, No. 14-166 (D.D.C. Aug. 22, 2014) ("Garrett Mem.") at 11, 17-19.   In *Saena Tech*, the Court noted that Saena Tech's owner, Jin Seok Kim, "took [more than $300,000] out of his pocket and bribed" In Seon Lim, but has, "in effect," been "immunized from prosecution," while others caught in Lim's web, including others far less blameworthy than Mr. Kim, have been branded as felons.   *United States v. Saena Tech Corp.*, No. 14-066, Tr. (Sept. 5, 2014) ("*Saena Tech* Tr.")* at 13, 56-57.  The Court described its role as "rais[ing] questions that . . . the public would raise," specifically, "why is this guy getting a sweetheart deal?"  *Id*. at 56.

The DPA between ID and the United States does not raise these concerns.  ID provided Mr. Lim with meals and entertainment worth a tiny fraction of the sums he received from Saena Tech, receiving no *quid pro quo,* and suffering a net loss from the contract at issue.   Yet ID has paid a monetary penalty nearly as high as that paid by Saena Tech, which stole $250,000 from the United States, and which received 15 subcontracts administered by Mr. Lim.  Furthermore, ID reported the improprieties involving Mr. Lim to the government nearly five years ago, and has cooperated fully in the investigation that disclosure initiated.   In order to prevent any similar misconduct in the future, ID has implemented a comprehensive enhancement of its corporate ethics and compliance program, and undertaken a radical corporate restructuring.  Finally, two ID employees, Chae Shim and Harry Martin, have pled guilty to one count of providing travel and entertainment gratuities to Mr. Lim, for which they are awaiting sentencing.  Mr. Shim is no longer with the company, and Mr. Martin voluntarily resigned his positions as ID's Chairman and CEO.  Finally, ID is currently in discussions with the Army's Suspension and Debarment

Officer ("SDO"), seeking to avoid a debarment order that would effectively put the company out of business.

In sum, unlike Saena Tech and Mr. Kim, ID and its employees have paid a stiff price for the misconduct in this case, and the DPA is both reasonable and fair.  The DPA represents a good faith effort by ID and the United States to address the underlying conduct in a manner that most effectively accommodates not only the parties' interests, but also the larger public interests.

In the *Saena Tech* matter, the Court and amicus also expressed concern regarding accountability under a DPA — *i.e.,* how the Court and the public may be assured that a criminal defendant fulfills the obligations imposed by such an agreement.  ID has already paid the fine called for by the DPA, and has spent several years redesigning its corporate ethics and compliance programs.  ID has undergone a radical restructuring, with new individuals in charge of ensuring the effectiveness of its ethics and compliance program.  Last but not least, ID is currently in negotiations with the Army SDO, seeking to avoid a debarment order that would destroy the company.  There can be little doubt that, if the United States Government chooses to continue doing business with ID, it will do so only with continued assurance that ID has taken, and continues to take, steps to ensure that no similar misconduct will occur in the future.

In sum, the DPA between ID and the United States represents an arms-length, reasonable and fair resolution of this matter, which will fully protect the public's interest.  ID is paying a steep price for its actions, and has taken significant steps to ensure strict conformance with the rule of law.  The issues raised by Saena Tech's "sweetheart deal" are simply not present here.

## 2.  The Scope Of The Court's Authority Under 18 U.S.C. § 3161(h)(2)

Charging decisions are vested in the Executive Branch.  *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987); *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967); *United States v. KPMG LLP*, No. 05-CR-903, 2007 WL 541956 *7 (S.D.N.Y.

Feb. 15, 2007).  The United States is therefore free to enter into an agreement conditioning a decision not to prosecute on the putative defendant's fulfillment of certain conditions.  As the Court has noted, deferred prosecution agreements can be very valuable in persuading individuals or corporations to change their conduct.  *Saena Tech* Tr. at 6.  And where a criminal prosecution may result in collateral consequences that impact not only the putative defendant, but also the general public (for example, where suspension of a government contractor would result in the loss of jobs), a deferred prosecution agreement between the United States and a corporation otherwise subject to criminal charges may be the means of resolving a criminal proceeding that best balances the interests of the prosecution, the defendant, and the public at large.

The Court plays a critical role with regard to a deferred prosecution agreement.  Absent the Court's "approval" under 18 U.S.C. § 3161(h)(2), a deferred prosecution agreement would be effectively unavailable, because the demands of the Speedy Trial Act would preclude an opportunity for the defendant to demonstrate its good conduct.  The Court's "approval" under 18 U.S.C. § 3161(h)(2) is therefore an indispensible part of the process by which a criminal proceeding may be resolved through a deferred prosecution agreement.

In *Saena Tech*, the United States and court-appointed amicus disagreed on the scope of the "approval" called for by the statute, which does not define the term or specify exactly what the Court must approve.  The United States took the position that the Court's role is "limited" to "deciding that a deferred prosecution is truly about diversion and not simply a vehicle to fend off a looming trial date."  Government's Supplemental Brief Addressing The Scope Of The Court's Authority To Consider The Fairness And Reasonableness Of A Deferred Prosecution Agreement In Deciding Whether To Accept Or Reject The Agreement at 1, *United States v. Saena Tech*, No. 14-0166 (Aug. 8, 2014).  Amicus, by contrast, took the position that "[i]n deciding whether to approve a deferred prosecution agreement, a court should conduct an individualized examination

whether it is reasonable, fair, comports with the goals of the Sentencing Guidelines, and is in the public interest." Garrett Mem. at 19.

It is ID's position that the United States is correct, and that the Court's role under 18 U.S.C. § 3161(h)(2) is "important, but limited" to ensuring that the DPA is not a collusive effort by the parties to circumvent the requirements of the Speedy Trial Act. This view is consistent with the statutory language and legislative history, and minimizes potential conflict between the Executive and Judicial Branches. It preserves the Executive Branch's charging discretion, while still providing the Court with the power to ensure that that discretion is not abused in a manner that circumvents the Speedy Trial Act.

But under either view of the scope of the Court's authority, the Court should grant its approval to the DPA between ID and the United States. As discussed above, the DPA is a fair and reasonable resolution of this matter, which advances the goals of punishing and preventing criminal behavior in a manner that best accommodates the larger public interest, while ensuring that ID remains accountable, and fulfills its obligations under the DPA.

## 3.  The Court's Contempt Power

As discussed above, ID has already fulfilled many of its obligations under the DPA, and has taken steps to ensure that it will fully satisfy the DPA's requirements. Therefore, even if the Court were to conclude that it has authority to use its contempt power to enforce the DPA, ID is confident that such an order will be unnecessary, and entirely committed to ensuring as much.

But in addition to the issue of the Court's authority in this regard, the potential use of the Court's contempt power in this context raises an additional concern.   Under the DPA, ID may be prosecuted in the event of a breach. This provides a powerful incentive for compliance by ID, as well as an effective remedy for the United States, making the exercise of the Court's contempt power unnecessary *unless* there is a divergence between the views of the United States

Attorney's Office and those of the Court with regard to ID's compliance.  And the obligations imposed on ID by the DPA — to "cooperate fully" with the United States and other law enforcement agencies, and to "implement a compliance and ethics program designed to prevent and detect violations of 18 U.S.C. § 201 and other applicable anti-corruption laws" — are not objectively measurable.[1]  The threat of a contempt sanction for violating an order to comply with the DPA would create uncertainty, and the potential for inconsistent interpretations of the DPA may actually impede ID's efforts to comply.

This does not leave the Court powerless to address the hypothetical situation raised by the Court in *Saena Tech* — *i.e.*, where a defendant "hasn't done anything" to meet its obligations under a deferred prosecution agreement approved by the Court under 18 U.S.C. § 3161(h)(2). *Saena Tech* Tr. at 34.  Evidence that a defendant has made no effort to comply, coupled with an insufficient explanation by the government of its decision not to declare a breach and proceed with prosecution, would strongly suggest that the agreement was, in fact, a sham, intended merely to avoid the time limits of the Speedy Trial Act.  In that case, § 3161(h)(2) would authorize the Court to cease excluding time under the Speedy Trial Act.

## CONCLUSION

For the foregoing reasons, the DPA is not only not a sham designed to ward off a looming trial date; it is a fair and reasonable resolution of this matter.  ID respectfully requests that the Court approve the exclusion of the DPA's term from computation under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161(h)(2).

Respectfully submitted,

---

[1] The DPA imposes one objectively measurable obligation on ID — the payment of a $300,000 monetary penalty, which obligation has already been met.

_/s/ Paul F. Enzinna_

Date:  January 5, 2015

Paul F. Enzinna
Brown Rudnick LLP
601 Thirteenth Street NW Suite 600
Washington, DC 20005
(202) 536-1732
(617) 289-0512 Fax
penzinna@brownrudnick.com

*Counsel for Defendant Intelligent Decisions, Inc.*

## CERTIFICATE OF SERVICE

I certify that on January 5, 2015, a copy of the foregoing Defendant's Brief Addressing The Issues Raised In The Court's Order Of November 13, 2014 with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/ Paul F. Enzinna

Paul F. Enzinna
Brown Rudnick LLP
601 Thirteenth Street NW Suite 600
Washington, DC 20005
(202) 536-1732
(617) 289-0512 Fax
penzinna@brownrudnick.com

*Counsel for Defendant Intelligent Decisions, Inc.*